1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                   EASTERN DISTRICT OF CALIFORNIA

8

9  IN RE:

10 SK FOODS, L.P.,

11           Debtor.

12 _____/

13 SCOTT SALYER,                          CIV. S-10-3467 LKK

14           Plaintiff,

15                 v.

16 SK FOODS, L.P.,                              O R D E R

17           Defendants.

18 _____/

19      Before the court are the appeals of two Bankruptcy Court

20 orders issued in connection with the Trustee's motion to approve

21 a compromise with a creditor, the Bank of Montreal ("BMO"):[1]

22 (i) the December 7, 2010 order granting BMO's *in limine* motion to

23 exclude the declaration of John P. Brincko; and (ii) the

24 ///

25 _____

26 [1] BMO is also the agent for other banks who loaned money to the
   debtors prior to the bankruptcy.  BMO and the other banks are
   referred to, collectively, as "BMO" or the "Secured Lenders."

1  December 13, 2010 order granting the Trustee's motion to approve

2  the compromise.

3      For the reasons described below, the exclusion motion is

4  reversed, and the order approving the compromise is vacated.

5                          **I.   BACKGROUND**

6  **A. The Bankruptcy**

7      This is a return visit of the Chapter 11 consolidated

8  bankruptcy case of SK Foods, L.P. and RHM Industrial/Specialty

9  Foods, Inc.[2]  BMO is a principal creditor of the bankruptcy

10  estate,[3] having loaned the Debtor $193 million about seven

11  months before the bankruptcy petitions were filed.

12      **1.   BMO's $200 Million Claim**

13      To secure the $193 million loan, BMO obtained a security

14  interest in "substantially all of the Debtors' assets" (the

15  "Pre-petition Collateral").[4]  Excerpts of Record ("ER"):24-25;

16  _____

17  [2] This court substantially affirmed the Bankruptcy Court's
   preliminary injunction relating to the disposition of certain
   non-debtor assets, Sharp v. Salyer (In re SK Foods, L.P.), 2010

18  WL 5136187, 2010 U.S. Dist. LEXIS 136178 (E.D. Cal. December 10,
   2010); and ordered a stay of all bankruptcy court proceedings

19  where there was a credible showing that "discovery from or
   testimony of Scott Salyer or his criminal counsel is relevant to

20  the proceedings" Sharp v. SSC Farms 1 (In re SK Foods, L.P.),
   2010 WL 5136189, 2010 U.S. Dist. LEXIS 136188 (E.D. Cal.

21  December 10, 2010), modified on rehearing, 2011 WL 1442332, 2011
   U.S. Dist. LEXIS 42766 (April 14, 2011).

22
   [3] An "estate" is created when a bankruptcy petition is filed.

23  11 U.S.C. § 541(a).  The estate consists of all the property
   belonging to the debtor, unless exempt.  11 U.S.C. § 541(a)(1).

24
   [4] A "security interest" is a "lien" created by an agreement.

25  11 U.S.C. § 101(51).  A "lien" is an interest in property to
   secure payment of a debt or performance of an obligation.  Id.,

26  § 101(37).

Trustee's Brief on Appeal at 8.  The security interest included all the "proceeds and products" of the Debtor's assets.  See Bankr. Dkt. No. 193, p.3  ¶ D (Bankr. Ct. Order, June 22, 2009). In addition, BMO asserted that all the Debtor's cash, and all the cash proceeds of the secured collateral, were its "Cash Collateral" pursuant to 11 U.S.C. § 363(a).[5]  Id.

Based upon this security interest, BMO asserts a claim in excess of $200 million against the estate, pursuant to 11 U.S.C. § 506(a) ("Determination of secured status").

### 2.  BMO's $26.77 Million "Super-Priority" Claim

In May and June 2009, the Bankruptcy Court issued orders providing "adequate protection" to the secured creditors, including BMO, pursuant to 11 U.S.C. § 361.  Bankr. Dkt. Nos. 20 ("Interim Order"), 30 ("Interim Order") & 193 ("Final Order"). "Adequate protection" is intended to protect a creditor's interest from diminution in the value of its collateral when the Trustee uses or sells the creditor's collateral.  See 11 U.S.C. § 363(b)(1); see In re Hawaiian Telcom Communications, Inc., 430 B.R. 564, 604 (Bkrtcy. D. Hawai'i 2009) ("An undersecured creditor is entitled to adequate protection payments to the extent that its collateral suffers from diminution in value").

---

[5] "Cash collateral" is the cash (and equivalents), "in which the estate and an entity other than the estate have an interest." 11 U.S.C. § 363(a).  If the pre-petition security interest includes proceeds of the collateral, then the post-petition proceeds of the collateral are also subject to the security interest.  11 U.S.C. § 552(b)(1).  The Bankruptcy Court may authorize the Trustee to use the Cash Collateral for the benefit of the estate.  11 U.S.C. § 363(c)(1) & (2).

1    As adequate protection, the Bankruptcy Court granted BMO

2  "valid and perfected, replacement security interests in and

3  liens (the 'Replacement Liens') on all prepetition and

4  postpetition assets and properties ... of the Debtors of any

5  kind or nature ...."[6]  Bankr. Dkt. No. 193, p.5-6, ¶ 4(a).

6    On June 17, 2009, the Bankruptcy Court granted the

7  Trustee's motion to approve the "Going Concern Sale of

8  Substantially All Operating Assets" of the estate, pursuant to

9  11 U.S.C. § 363.[7]  Bankr. Dkt. No. 325.  BMO asserts that

10  pursuant to that authorization, $102 million worth (or as much

11  as $129 million) of its secured collateral was sold. ER:12-13

12  ¶ 16 (Bankr. Ct. Decl. of Stan Speer).  However, BMO asserts

13  that the sale realized only $67 million in proceeds.  Id.

14    The difference between the value of the collateral and what

15  was realized in the sale (less the $3 million to $13 million BMO

16  anticipates receiving from the compromise under appeal here), is

17  a "diminution in value" in BMO's collateral, of $22 million to

18  $59 million, according to BMO.  Id.  BMO therefore asserts that

19  it is entitled to a "super-priority claim"  to the extent of the

20  diminution in value.[8]  After negotiations, BMO and the Trustee

21  ────────────────────

22  [6] "Adequate protection" may take the form of replacement liens,
    cash payment(s) to the creditor, or other relief.  11 U.S.C.

23  § 361.

24  [7] The Trustee, Bradley B. Sharp, was appointed on May 18, 2009.
    Bankr. Dkt. No. 127.

25  [8] If the "adequate protection" proves inadequate to protect the
    creditor's interest, the creditor may assert a "super-priority

26  claim" in the amount that his interest is left unprotected.

4

1  agreed on a BMO "super-priority claim" of $27.66 million.   ER:16
2  ¶ 21.

3              **3.   The Unsecured Claim**

4       BMO's third claim is an unsecured claim for whatever of the
5  Credit Agreement amount is still due after BMO collects on the
6  secured claim and the super-priority claim.   ER:3.

7  **C. The Motion To Approve the Compromise.**

8       On September 29, 2010, the Trustee filed a motion, pursuant
9  to Fed. R. Bankr. P. 9019, before the Bankruptcy Court, to
10  approve a compromise (the Settlement Agreement) between the
11  Trustee and BMO.[9]   The Bankruptcy Court heard the motion on

12  _____

13  11 U.S.C. § 507(b).   The Fifth Circuit put it this way:

14       adequate protection of a secured creditor's collateral and
         its fallback administrative priority claim are tradeoffs
15       for the automatic stay that prevents foreclosure on
         debtors' assets: the debtor receives "breathing room" to
16       reorganize, while the present value of a creditor's
         interests is protected throughout the reorganization. ...
17       A secured creditor whose collateral is subject to the
         automatic stay may first seek adequate protection for
18       diminution of the value of the property, 11 U.S.C. §§
         362(d)(1), 363(e), 364(d), and then, if the protection
19       ultimately proves inadequate, a priority administrative
         claim under § 507(b). Section 507(b) of the Bankruptcy Code
20       allows an administrative expense claim under § 503(b) where
         adequate protection payments prove insufficient to
21       compensate a secured creditor for the diminution in the
         value of its collateral.   "It is an attempt to codify a
22       statutory fail-safe system in recognition of the ultimate
         reality that protection previously determined the
23       'indubitable equivalent' ... may later prove inadequate."

24  <u>In re Scopac</u>, 624 F.3d 274, 282 (5th Cir. 2010).

25  [9] "On motion by the trustee and after notice and a hearing, the
    court may approve a compromise or settlement."   Fed. R. Bankr.
26  P. 9019(a).

                                5

1  October 27, 2010, whereupon it requested further briefing and

2  the submission of "additional evidence."  ER:270.

3     **1.   The Revised Settlement Agreement and the Trustee's
           Declaration in Support of the Compromise.**

4

5     On November 3, 2010, the Trustee filed his Second

6  Supplemental Declaration in support of the motion to approve the

7  compromise.  ER:271.  The Declaration attached the Revised

8  Settlement Agreement, ER:276, which is the subject of this

9  appeal.

10    Pursuant to the Revised Settlement Agreement, which was

11  contingent upon the approval of the Bankruptcy Court, the

12  Trustee will "abandon, transfer and convey" to BMO: certain

13  accounts receivables, trade receivables and related litigation;

14  proceeds from the sale of certain property; the Trustee's right

15  to recover from certain litigation; tax refunds; the Trustee's

16  right to collect pursuant to the Credit Agreement; refunds;

17  certain "reserves;" certain reimbursements; and certain

18  "Assigned Rights."  In addition, BMO will receive a $2.3939

19  million payment from sales and proceeds of Estate Assets, plus

20  80% of all such proceeds until its super-priority claim is paid

21  in full.  Finally, BMO will get in line with all other

22  unsecured, non-priority creditors to receive the remainder of

23  the money owed to it on the Credit Agreement, out of whatever is

24  left of the Estate.  ER:276-82 (Trustee's Second Supplemental

25  Declaration, Exh. A).

26  ///

**2. The Brincko Declaration**

On November 17, 2010, the Objecting Parties filed the Declaration of John P. Brincko in support of their Supplemental Objection to approving the compromise.[10]  ER:293, 321.

**3. The Trustee's Reply**

On November 24, 2010, the Trustee filed his Reply, noting that it did "not object" to the bankruptcy court's considering the Brincko Declaration "for the purpose of showing that there is a factual dispute over the value of BMO's collateral as of the date of the motion."  ER:626.  However, the Trustee did "not concede that Mr. Brincko is qualified to provide expert testimony or that his conclusions and methodology are correct." Id.

**4. The Motion To Exclude the Brincko Declaration.**

On November 24, 2010, The Bank of Montreal filed a motion *in limine* to exclude the Brincko Declaration, arguing that (i) his declaration was not properly and timely noticed and disclosed under Fed. R. Civ. P 26; and (ii) even if Rule 26 doesn't apply,[11] Brincko's opinion is neither reliable nor relevant, and thus fails the test of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).  ER:630.

---

[10] The scope of the Brincko declaration was limited to establishing "the amount of any super priority claim of the Lenders pursuant to Section 507(b) of the Bankruptcy Code due to the diminution in value of the Lenders' Prepetition Collateral." ER:324.

[11] See Bankr. E.D. Cal. R. 7026-1(b).

**D. The Bankruptcy Court Rulings**

On December 6, 2010, the Bankruptcy Court held its second hearing on the motion to approve the compromise.  ER:655.  On December 7, 2010, the Bankruptcy Court issued its order granting BMO's *in limine* motion to exclude the Brincko Declaration.  On December 13, 2010, the Bankruptcy Court issued its order granting the Trustee's Rule 9019 motion to approve the compromise, on the grounds that it was "fair and equitable."  On December 27, 2010, the Objecting Parties timely filed their Notice of Appeal.[12]

**II. ANALYSIS**

**A.   Mootness**[13]

The Trustee argues that the appeal is moot because the Revised Settlement Agreement "has been fully implemented (*i.e.* cash and litigation claims have been transferred to BMO, and releases of claims which would now be time-barred have now been granted)."

///

///

///

_____

[12] <u>See</u> Fed. R. Bankr. P. 8002(a).

[13] The Trustee raises mootness in his brief opposing the appeal. This order will address the mootness issue first because equitable mootness is considered to be jurisdictional in the Ninth Circuit.  <u>See</u> <u>Sherman v. SEC (In re Sherman)</u>, 491 F.3d 948, 965 n.20 (9th Cir. 2007).  Section 363(m) mootness presents similar issues.

**1. Equitable Mootness**

  **a. The Standard for Equitable Mootness in the bankruptcy context.**

  Bankruptcy appeals may become equitably moot when events occur "that make it impossible for the appellate court to fashion effective relief." <u>Focus Media, Inc. V. NBC Inc. (In re Focus Media, Inc.)</u>, 378 F.3d 916, 922 (9th Cir. 2004).  This includes cases where the settlement transaction is too "complex or difficult to unwind." <u>See Lowenschuss v. Selnick (In re Lowenschuss)</u>, 170 F.3d 923, 933 (9th Cir. 1999).  Moreover, if appellants did not diligently pursue a stay of the objected-to order in the bankruptcy court, thus permitting "a comprehensive change of circumstances to occur," it may be "inequitable" to consider the appeal. <u>In re Focus Media</u>, 378 F.3d at 923.  The "heavy" burden of establishing mootness is on the party advocating its application. <u>Id.</u>

  **b. The mootness standard is not met here**

    **i. The Trustee has not shown that the Revised Settlement Agreement has been "fully implemented"**

  The Trustee argues that the settlement under appeal has been "fully implemented." Trustee's Brief on Appeal at 1.  He states that "cash and litigation claims have been transferred to BMO, and releases of claims which would now be time-barred have now been granted." <u>Id.</u>  Accordingly, he argues, "it would be impossible for a court to restore the status quo that existed prior to the entry into and approval of the settlement." <u>Id.</u>

1    In support of these assertions, the Trustee cites his

2  Request for Judicial Notice, asserting that documents submitted

3  there establish that BMO has been substituted for the Trustee in

4  four adversary proceedings within Case No. 09-29162-D-11 (<u>In re</u>

5  <u>SK Foods</u>).[14]   However, the Trustee does not address the fate of

6  the rest of the Revised Settlement Agreement, that is, all the

7  other Revised Settlement Agreement Items that are not covered by

8  the Request for Judicial Notice, namely claims:

9  2(A) (unspecified accounts receivable, trade receivables and

10 "the related Accounts Receivable litigation"); 2(C) & (I)

11 (proceeds of sales); 2(D) (equipment related to the Drum Line

12 Litigation);[15] 2(E) (tax refunds other than those from IRS and

13 State tax avoidance actions); 2(F) (BMO's Cash Collateral

14 claims); 2(G) (refunds from "Split Dollar Life Receipts");

15

16 [14] <u>See</u> Request for Judicial Notice, Tabs 1-4: (i) <u>Sharp v. CSS,</u>
   <u>LP</u>, Adv. Proc. No. 09-02543, the "Drum Line Litigation," which
17 appears to correspond to Item 2(D) of the Revised Settlement
   Agreement; (ii) <u>Sharp v. Salyer</u>, Adv. Proc. No. 10-02015, a
18 "Breach of Fiduciary Duty Action" which appears to correspond to
   an entry in Item 3 of the Revised Settlement Agreement ("Salyer
19 Breach of Fiduciary Duty Litigation"); (iii) <u>Sharp v. IRS</u>, Adv.
   Proc. No. 10-02117, an action to recover $5.1 million in
20 fraudulent conveyances, which appears to correspond to part of
   an entry in Item 3 of the Revised Settlement Agreement ("IRS
21 and State Tax Avoidance Actions"); and (iv) <u>SK Foods, L.P. ex rel.</u>
   <u>Sharp v. Lidestri Foods</u>, Adv. Proc. No. 10-02163, the "Frito Lay
22 Action," which appears to correspond to Item 2(B) of the Revised
   Settlement Agreement. These judicial documents are "verifiable
23 with certainty" and Appellant does not challenge them;
   accordingly, the court takes judicial notice of them.   <u>See</u> <u>U.S.</u>
24 <u>v. Camp</u>, 723 F.2d 741, 744 (9th Cir. 1984).

25 [15] The Tab 1 Adversary Proceeding appears to cover the proceeds,
   recovery and right to recovery from the litigation, but it makes
26 no mention of this equipment.

1  2(H) ("Westland Insurance Claims"); 2(J) & (K) (reserves); 2(L)

2  (the "BMO Distribution"); 3 (claims against accountants and the

3  "New Zealand Claims").

4      Accordingly, the Trustee has simply asserted, but not

5  provided any supporting documentation or other evidence, that

6  the Revised Settlement Agreement has been "fully implemented."

7              **ii.   The Trustee has not shown that the Revised
             Settlement Agreement cannot be undone.**

8

9      Under the Revised Settlement Agreement, the Trustee

10  transferred several assets to BMO, some of which are causes of

11  action.  The Trustee asserts that in those causes of action, BMO

12  has already been substituted in as plaintiff in the place of the

13  Trustee.

14      But the Trustee does not argue with any specificity that

15  any specific aspect of the Revised Settlement Agreement cannot

16  be undone.  These substitutions occurred in Adversary

17  Proceedings before the Bankruptcy Court.  The Trustee does not

18  explain why this court is incapable of issuing an order vacating

19  the Bankruptcy Court order substituting parties.  Indeed, it

20  appears that this court has the authority to do so.  See Fed. R.

21  Bankr. P. 8013 (district court may "affirm, modify, or reverse"

22  or remand the bankruptcy court order).  Accordingly, the Trustee

23  has not identified "specific events or developments in the

24  proceedings that preclude relief."  See In re Focus Media,

25  378 F.3d at 923-924.

26  ///

The Trustee does assert that one of the Adversary Proceedings is nearing settlement.  But he does not explain why the Trustee cannot be substituted back in as plaintiff prior to the settlement.  Nor does he explain why, if it is too late to re-substitute the Trustee back in, the Bankruptcy Court (under direction from this court), could not simply order BMO to pay the settlement proceeds over to the Trustee.

As for the asserted transfer of items other than causes of action, the Trustee similarly does not show why these transfers could not be reversed.  There is no explanation, for example, of why the Drum Line equipment cannot simply be returned under order of the bankruptcy court.  Nor does the Trustee show why accounts receivable, trade receivables, reserves, reimbursements and causes of action cannot be transferred back, nor why refunds and sale proceeds cannot be re-paid.[16]  Accordingly, the Trustee has not shown that any portion of the settlement, even if it has been executed, is too "complex or difficult to unwind."  See In re Lowenschuss, 170 F.3d at 933.[17]

---

[16] There may very well be good reasons why these transactions, if they have already occurred, cannot be undone, but the Trustee has not met his burden to demonstrate it.

[17] It is true that the Objecting Parties have not sought a stay pending appeal, for reasons that are unexplained here.  This is a key factor in considering equitable mootness.  See Suter v. Goedert, 504 F.3d 982, 990 (9th Cir. 2007) ("the cases dealing with mootness under the bankruptcy code recite the general rule that an appeal is moot if the appellant fails to obtain a stay of the order permitting sale of an asset").  However, this factor only arises if failure to obtain a stay has led to "such a comprehensive change of circumstances" that considering the appeal is inequitable.  In re Focus Media, 378 F.3d at 923.  The

1    **2. Section 363(m) Mootness.**

2       The Trustee argues that the appeal is also moot pursuant to

3    11 U.S.C. § 363(m).  That bankruptcy provision provides:

4       The reversal or modification on appeal of an authorization

5       under subsection (b) or (c) of this section of a sale or

6       lease of property does not affect [its] validity ... to an

7       entity that purchased or leased such property in good

8       faith, ... unless such authorization and such sale or lease

9       were stayed pending appeal.

10   11 U.S.C. § 363(m).  By its terms, the provision applies "when

11   an appellant has failed to obtain a stay from an order *that*

12   *permits a sale of a debtor's assets.*"  <u>Onouli-Kona Land Co. v.</u>

13   <u>Estate of Richards (In re Onouli-Kona Land Co.)</u>, 846 F.2d 1170,

14   1171 (9th Cir. 1988) (emphasis added).

15      The order appealed from, however, grants a Rule 9019 motion

16   to approve a settlement.  Section 363(m) mootness does not, by

17   its terms, apply to orders approving compromises, it applies to

18   orders granting Section 363(b) or (c) motions to sell assets.

19   <u>See</u> 11 U.S.C. § 363(m) (applying stay rule to "authorization

20   under subsection (b) or (c) of this section of a sale or lease

21   of property").

22   ///

23   ─────────────────────

24   Trustee has not established the predicate "comprehensive change"
     in this case.  Of course, this ruling is based upon the state of

25   affairs as they are presented to this court when the appeal was
     filed and oral argument was presented.  It is not intended to

26   preclude the same argument on any subsequent appeal, should
     Objecting Parties persist in not seeking a stay.

1    The Trustee nevertheless argues that "it is well
2  recognized" that orders approving compromises under Rule 9019
3  are actually orders authorizing asset sales, pursuant to
4  Section 363.  However, it is clear from the record that in the
5  Trustee's motion to approve <u>this</u> compromise, the motion was not
6  identified as a Section 363 asset sale, it was not briefed as
7  such a sale, and the Bankruptcy Court did not indicate that it
8  was deciding the issue under Section 363.[18]  This court therefore
9  will not hold Objecting Parties to its standards.

10  **B. Exclusion of the Brincko Declaration**

11      **1.    Standard of Review**

12    The bankruptcy court's evidentiary rulings are reviewed for
13  abuse of discretion.  <u>California State Board of Equalization v.</u>
14  <u>Renovisor's, Inc. (In re Renovizor's, Inc.)</u>, 282 F.3d 1233, 1237
15  n.1 (9th Cir. 2002).  To reverse on the basis that an
16  evidentiary ruling was erroneous, the court must conclude not
17  only that the bankruptcy court abused its discretion, but also
18  that the error was prejudicial.  <u>See</u> <u>McEuin v. Crown Equip.</u>
19  <u>Corp.</u>, 328 F.3d 1028, 1032 (9th Cir. 2003).

20  ///

21  ///

---

[18] Clearly, the Trustee knew how to present such a motion.  The
Bankruptcy Court record shows that on several occasions, the
Trustee filed applications to conduct a Section 363 sale.  They
were clearly identified as such; they were not identified as
Rule 9019 motions.  <u>See, e.g.</u>, Bankr. Dkt. No. 118
("Motion/Application for Order Approving Going Concern Sale of
Substantially All Operating Assets Pursuant to 11 U.S.C. Section
363").

**2.    The Brincko Declaration Was Offered In Accordance with the Scheduling Order**

The Bankruptcy Court excluded the Brincko Declaration on the grounds that it was offered after the evidentiary record had closed.  The Objecting Parties persuasively argue that the court's exclusion of the Brincko Declaration was erroneous because the evidentiary record had not closed before the declaration was offered.

On October 27, 2010, the Bankruptcy Court held a hearing on the Trustee's motion to approve the compromise.  The court opened with its views of some of the "fatal" and other flaws in the compromise, and ways those flaws could be cured.  See ER:235-37.  Although the Bankruptcy Court then stated that it did not believe an evidentiary hearing was called for, it later did call for more evidence to be developed.  The court made clear that the Objecting Parties had a right to take depositions of the Trustee and the declarants who gave evidence in support of the compromise.  See ER:237-40.  The court clearly expected that the Trustee would submit a revised settlement agreement and that other declarations would be filed in advance of the next hearing.  See ER:264.  After the October 27, 2010 hearing, the Bankruptcy Court issued a Scheduling Order giving the Trustee until November 3, 2010 "to submit supplemental briefs and/or declarations *and other evidence* in support of the Motion." ER:270 (emphasis added).  The same order gave the Objecting Parties until November 17, 2010 to file "supplemental

1   objections" to the motion.  Nothing in the order indicated that

2   the Trustee *could* file additional "declarations" and "additional

3   evidence" in support of the motion, but that the Objecting

4   Parties were *precluded* from filing declarations or other

5   evidence in opposition to the motion.

6        The Trustee cites the local bankruptcy rules to argue that

7   the evidentiary record closed when he filed his Reply on

8   October 20, 2010.  That rule provides:

9        Unless the Court determines that an evidentiary hearing is

10       necessary, the evidentiary record closes upon expiration of

11       the time for the filing of the reply.

12   Bankr. E.D. Local R. 9014-1(f)(iii).  In this case, however, the

13   Bankruptcy Court specifically requested the submission of

14   "additional evidence."  It gave the parties until November 17,

15   2010 to submit it, and the Brincko Declaration was submitted

16   within that time.

17        The Trustee argues that the supplemental declarations and

18   "additional evidence" the Bankruptcy Court was referring to was

19   intended to refer solely to the Objecting Parties' right to

20   depose the Trustee's declarants, and that the Brincko

21   Declaration was beyond the "limited scope" of the upcoming

22   hearing.  But this argument does not accord with either the

23   order itself or the transcript of the hearing.

24        During the hearing, the Bankruptcy Judge made clear that

25   the Trustee would have to submit a revised agreement and

26   declarations in order to fix the "fatal" and other flaws he saw

16

1  in it.  See ER:235-37.  In accordance with those instructions,

2  the Trustee filed a *new declaration*; he did not simply make

3  himself and his other declarants available to be deposed.  And,

4  the Bankruptcy Court must have considered that new evidence from

5  the Trustee, because it is the only place in the record where

6  the Revised Settlement Agreement – the subject of the Bankruptcy

7  Court's order – appears.  Objecting Parties assert that the

8  Brincko Declaration was submitted to rebut the new declaration

9  submitted by the Trustee, and to rebut the super-priority claim

10 contained in the Revised Settlement Agreement.

11      In short, the Bankruptcy Court requested "additional

12 evidence," and that is what the Objecting Parties submitted.

13 The court cannot schedule the submission of additional evidence,

14 accept evidence submitted by one side, and then simply reject as

15 untimely the timely-filed evidence submitted by the other side

16 in rebuttal.[19]  Accordingly, it was an abuse of the Bankruptcy

17 Court's discretion to exclude the Brincko Declaration as

18 untimely, when in fact it was timely submitted in accordance

19 with the court's instructions.[20]

20 ───────────────

21 [19] The Trustee relies upon <u>Reed v. Anderson (In re Reed)</u>,
   422 B.R. 214 (C.D. Cal. 2009).  In that case, the Bankruptcy

22 Court excluded evidence because "'it was not submitted pursuant
   to the specified procedure.'"  <u>Id.</u>  In this case, the Objecting

23 Parties proffered the Brincko Declaration pursuant to the
   procedure specified by the Bankruptcy Court, both at the hearing
   and in its subsequent order.

24

25 [20] This court takes no position on whether it might be proper for
   the Bankruptcy Court to reject the proffered declaration on

26 other grounds.  For example, BMO argued in the Bankruptcy Court
   that the Brincko Declaration should be excluded for failure to

**3.   Exclusion of the Brincko Declaration Was Not Harmless.**

The Trustee argues that the exclusion of the Brincko Declaration was at worst, harmless error, because the only thing the Declaration revealed was that litigation over the super-priority claim would be long, complex and costly.  In order to determine whether the exclusion was harmless error, it is necessary to examine the Bankruptcy Court's decision to approve the compromise, and whether the proffered declaration could reasonably be excluded from that process, given this court's ruling, <u>supra</u>, that the declaration was properly offered.

In deciding on the motion to approve the BMO compromise, the Bankruptcy Court has "great latitude."  <u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>, 839 F.2d 610, 620 (9th Cir. 1988).  Nevertheless, it can approve the compromise "only if it is 'fair and equitable.'"  <u>Id.</u>  The Bankruptcy Court makes this determination by considering the following:

> "(a) The probability of success in the litigation;
>
> (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (d) the

///

meet the requirements of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579(1993).  However, the Bankruptcy Court did not make a determination under <u>Daubert</u>, and there has been no briefing or oral argument regarding the issue on this appeal. It is for the Bankruptcy Court to make this determination in the first instance.

1          paramount interest of the creditors and a proper

2          deference to their reasonable views in the premises."

3    Id., quoting Martin v. Kane (In re A & C Properties), 784 F.2d

4    1377, 1380-81 (9th Cir.), cert. denied sub nom. Martin v.

5    Robinson, 479 U.S. 854 (1986).

6        The very first consideration, then, is the probability of

7    success in the litigation.  In the context of the compromise on

8    appeal here, the Bankruptcy Court was required to consider the

9    probability that BMO would be able to establish that its super-

10   priority claim was worth $22 to $59 million, if it had to

11   litigate the issue.  See In re A & C Properties, 784 F.2d at

12   1382 (the Bankruptcy Court must apprise itself "'of all facts

13   necessary for an intelligent and objective opinion of the

14   probabilities of ultimate success should the claim be

15   litigated'").

16       The Bankruptcy Court determined that this factor weighed

17   "in favor of the compromise."  ER:733.  In reaching this

18   conclusion, the Bankruptcy Court considered BMO and the

19   Trustee's valuation of the claim, noting that "BMO contends the

20   SPC is somewhere between $22 million and $59 million," and that

21   "the compromise reflects a highly beneficial outcome for the

22   estate."  ER:734.  Implicitly then, the Bankruptcy Court found

23   that BMO was likely to prevail in litigation on the claim, at

24   least at the low end of its estimate.  But in reaching this

25   conclusion, the Bankruptcy Court did not consider the Objecting

26   Parties' position.  While noting that the Objecting Parties had

a different valuation,[21] the Bankruptcy Court simply "decline[d] the Salyer entities' invitation to resolve these disputes." ER:752.

This misconceives the Bankruptcy Court role in ruling on a Rule 9019 motion.  Under the proper standard, the Bankruptcy Court was not called upon to <u>resolve</u> the dispute about the proper valuation of the claim, but it was required to <u>consider the likelihood</u> that BMO would succeed in litigation over it.[22] It could not give the issue proper considering by relying only on the evidence presented by one side of the litigation.  To illustrate, the Bankruptcy Court considered whether a settlement was fair and equitable if the range of super-priority claim possibilities was from $22 million on the low end, and $59 million on the high end.  Given this range, it determined

---

[21] The Bankruptcy Court did acknowledge Objecting Parties' position that BMO suffered "no significant loss" on its collateral, and that they asserted that liquidation value, not "going concern" value was the appropriate measure of such a loss.

[22] At oral argument, the Trustee relied on <u>In re A & C Properties</u> and <u>Port O'Call Investment Co. V. Blair (In re Blair)</u>, 538 F.2d 849 (9th Cir. 1976) for the proposition that the Bankruptcy Court was not required to conduct a "mini-trial" on the super-priority claim.  It is true that the Bankruptcy Court did not have to conduct a mini-trial, but it did have to consider what was the likelihood of success of any litigation over the super-priority claim.  This consideration turns on the legal uncertainty pointed out by counsel at oral argument, the uncertainty in the valuation of the claim, and possibly other factors.  Since there does not appear to be controlling Ninth Circuit authority on the issue, it is not simply a legal issue which this court could resolve here and now.  Rather, it is a factor in the "likelihood of success" consideration, which is best determined in the first instance by the Bankruptcy Court.

1   that it was reasonable to accept BMO's generous offer to value

2   its own claim at the "lowest end of its own range of values,

3   such that the compromise reflects a highly beneficial outcome

4   for the estate."  ER:734-35.  But it cannot be determined

5   whether a settlement is fair and equitable by looking only at

6   the range of outcomes asserted by one side of that litigation.[23]

7   The only evidence of the other side's range of outcomes,

8   however, is contained in the Brincko Declaration, which was

9   erroneously excluded from consideration.

10      As noted, the Bankruptcy Court did acknowledge that the

11   Objecting Parties asserted a different view of the possible

12   outcome of the litigation.  But the court's role at that point

13   was to include these assertions in its consideration of the

14   probability of success in the litigation.  The Bankruptcy Court

15   did not do so.  Instead, it used those assertions only to

16   conclude that the litigation would be "long, complex, difficult,

17   and costly."  ER:752.  This observation could well be correct,

18   but it does not relieve the Bankruptcy Court of its obligation

19   to consider the likelihood of success in litigation.

20      By erroneously excluding the Brincko Declaration, and by

21   further declining to consider which valuation method

22   (liquidation or "going concern") was likely to prevail in

23   ///

24   

25   [23] This is highlighted by the fact that, according to the
     evidence offered by Objecting Parties, the low end of the range
26   of litigation outcomes is $0.00, not $22 million.

1   litigation,[24] the Bankruptcy Court could not properly consider

2   the "likeliness of success in litigation" factor it was required

3   to consider under In re A & C Properties.   The court indicated

4   that it did not need to determine the value of the super-

5   priority claim, but only whether "the compromise, on balance,

6   falls below the lowest point in the range of reasonableness."

7   ER:734.   The problem here is that the "range of reasonableness"

8   the Bankruptcy Court was considering was based upon a possible

9   litigation outcome range of $22 million to $59 million.   It may

10  well have reached a different conclusion if the litigation

11  outcome range it considered was from $0.00 to $59 million.[25]

12  Accordingly, this court cannot say that the error was harmless.

_____

14  [24] There appears to be no controlling authority on the valuation
    question, and the non-controlling cases come out on both sides.
15  See United Missouri Bank v. Federman (In re Modern Warehouse,
    Inc.), 74 B.R. 173 (W.D. Mo. 1987) (liquidation value).   See
16  also, In re Scopac, 624 F.3d 274, 285 (5th Cir. 2 010) ("In
    general, when valuing a secured claim under 11 U.S.C.
17  § 506(a)(1), fair-market value is the appropriate measure").
    The Ninth Circuit in Crocker Nat'l Bank v. American Mariner
18  Industries, Inc. (In re American Mariner Industries, Inc.),
    734 F.2d 426, 435 (1984), seems to hold that the court should
19  look to "liquidation" value when considering "adequate
    protection."   But that case was overruled by United Savings
20  Ass'n v. Timbers of Inwood, 484 U.S. 365 (1988), on a closely
    related point, see Cimarron Investors v. Wyid Properties (In re
21  Cimarron Investors), 848 F.2d 974, 976 (9th Cir. 1988), and it
    is not clear that In re American Mariner can now be relied upon
22  on this issue.

23  [25] It is worth noting that the BMO estimate is based, at least in
    part, on "reports prepared pre-petition by the debtor's
24  financial advisors."   ER:734.   However, no party disputes on
    appeal that those reports were based upon a "going concern"
25  valuation, rather than the liquidation valuation that Objecting
    Parties claim is the proper valuation for determining the super-
26  priority claim in this case.

**III. CONCLUSION**

For the foregoing reasons, (i) the appeal of Objecting Parties is not moot; and (ii) the Bankruptcy Court erred by excluding the Brincko Declaration on the basis that it was submitted after the close of the evidentiary period.  Therefore, IT IS ORDERED that the matter is REMANDED to the Bankruptcy Court for further proceedings consistent with this order.

IT IS SO ORDERED.

DATED:   July 8, 2011.

LAWRENCE K. KARLTON
SENIOR JUDGE
UNITED STATES DISTRICT COURT